IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ZACHERY WILSON,                        *
                                       *
        Plaintiff,                     *
                                       *
vs.                                    *  CIVIL ACTION NO. 14-00114-KD-B
                                       *
GARY SCARBROUGH, *et al.*,             *
                                       *
        Defendants.                    *

## REPORT AND RECOMMENDATION

Plaintiff, Zachery Wilson, proceeding *pro se* and *in forma pauperis*, filed a complaint seeking relief under 42 U.S.C. § 1983. (Doc. 7). This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. CivLR 72(a)(2)(R), and is now before the Court on Defendants Gary Scarbrough and Ashley Kidd's Motion for Summary Judgment (Docs. 29, 30). After careful consideration of Defendants' motion and supporting materials, and Plaintiff's Amended Complaint, evidentiary materials, and brief in opposition, the undersigned recommends that Defendants' motion be **GRANTED** and that this action be **DISMISSED** with prejudice.

## I.  SUMMARY OF FACTUAL ALLEGATIONS

The relevant facts from Plaintiff's Amended Complaint disclose the following events. Plaintiff Wilson is a state prisoner in the custody of the Alabama Department of

Corrections. Plaintiff's claims arise out of an incident that occurred on October 1, 2013, while Wilson was incarcerated at Holman Correctional Facility. According to Wilson, he was smoking a cigarette at the S-4 gate when he was approached by Defendant Kidd. (Doc. 7 at 4). (Id.). Kidd instructed Wilson to put out his cigarette and informed him he would receive a disciplinary for smoking at the gate. (Id. at 9). Wilson claims that Kidd was "personalizing and singling [Wilson] out of a crowd of people who were smoking cigarettes". (Id.). According to Wilson, Kidd "snapped" and told him to stop making gestures because she felt threatened, so he threw his hands "Sky High" in the air. (Id.). Kidd then instructed him to take his hands out of the air and place them behind his back, because he was going to lock up. (Id.). While Wilson "pleaded" with Kidd not to lock him up, several officers came running to where Wilson and Kidd were standing, including Defendant Scarbrough. (Id. at 9-10).

Wilson contends that Scarbrough grabbed another officer's mace and sprayed an "exceeding" amount in Wilson's left eye at "point blank range". (Id. at 10). Scarbrough then snatched Wilson's arms and placed them behind his back in an awkward position. (Id.). While Wilson's arms were behind his back, Defendant Scarbrough grabbed Wilson's right thumb and bent it until it popped. (Id.). Wilson further alleges that Scarbrough bent one of his arms upward and twisted the other inward. (Id.).

Kidd observed Scarbrough's actions, but failed to intervene and stop Scarbrough. (Id.). While escorting Wilson to the health care unit, Scarbrough yanked, snatched, and twisted on the chain of Wilson's handcuffs. (Id.).

Wilson asserts a claim of excessive force against Defendant Scarbrough and claims of failure to intervene, and supervisor liability against Defendant Kidd[1]. (Id.). Wilson claims that he was injured as a result of this incident. (Id. at 11). Specifically, Wilson claims that he suffered a pinched nerve in his left eye, a dislocated joint in his right thumb, and joint inflammation caused by the excessive force that Scarbrough used against him. (Id.). He seeks $250,000 in punitive damages and $25,000 in compensatory damages from each Defendant. (Id. at 7).

In support of his amended complaint, Wilson submitted copies of inmate request sheets that he submitted regarding his medical care, and two declarations, signed under penalty of perjury, by two fellow inmates. In his declaration, LaSamuel Gamble #197984, assets that on October 1, 2013, he observed Defendant Kidd tell Wilson to "put the damn cigarette out and bring his ass here". (Doc. 17 at 5). Gamble asserts that Wilson

---

[1] While Wilson originally asserted multiple claims against several Defendants in his Amended Complaint, he voluntarily dismissed all claims against all Defendants except for his claims against Defendants Scarbrough and Kidd. (Doc. 7 at 5, Doc. 20).

went over to Kidd, but he was not able to hear the conversation between them. However, he observed Wilson throw his hands in the air, several officers surround Wilson, and Defendant Scarbrough grab officer Smith's mace and spray "a lot of mace directly into Wilson's face".(Id.) Gamble further asserts that he then saw Scarbrough turn Wilson around and place Wilson's arms in an awkward position, and then handcuff him. According to Gamble, Scarbrough handled Wilson "pretty rough", and as a result, a lot of the guys got frustrated watching Scarbrough. (Id.). Gamble also questioned whether Wilson should have been sent to segregation for smoking rather than just issued a citation. (Id.)

In his declaration, Andrew Askew alleges that as he was leaving the pill call window, he saw Wilson talking to Kidd with his hands in the air, while surrounded by other officers, including Scarbrough. (Doc. 17 at 6). Askew asserts that Wilson was "crying real bad" and telling Kidd "Why do she keep personalizing against him". Askew further asserts that Scarbrough directed him to move on, and that by the time he reached the S-5 gate, Scarborough had snatched officer Smith's mace, and started spraying Wilson. (Id.) Askew contends that Scarborough sprayed almost the whole can of mace directly in Wilson's face at close range. According to Askew, Scarborough

started getting "over aggressive" with Wilson when he was handcuffing him.(Id.)

On June 26, 2015, Defendants Scarbrough and Kidd filed their Special Report and Answer denying Wilson's allegations against them and denying that any of his constitutional rights were violated. (Docs. 29, 30). In their Special Report, Defendants argue that Wilson's excessive force claim is without merit, as the force used was not exercised "maliciously and sadistically for the very purpose of causing harm", but was instead used to subdue Wilson and maintain order and discipline for the safety of the officers and other inmates. (Doc. 29 at 5-7)(citations omitted). They further contend that prison officials did not act with deliberate indifference to the possibility of serious harm, and the injuries suffered by the Plaintiff were *de minimis*. (Id. at 7-9). Finally, Defendants contend that all claims against them are barred by absolute and qualified immunity. (Id. at 9-10).

In support of their Special Report, Scarbrough and Kidd have submitted sworn affidavits and other documents. (Docs. 29-1; 29-2; 29-3; 29-4; 29-5; 29-6; 29-7; 29-8; 29-9; 29-10). In Defendant Kidd's affidavits, she asserts that on the day in question, while working as the assistant shift commander at the Holman facility, she observed Wilson smoking a cigarette in the main hall, near the S-4 gate, in violation of institution policy

prohibiting smoking on the inside. (Doc. 29-2). Kidd asserts
that she reprimanded Wilson about his behavior and informed him
that he would be disciplined. (Id.). Wilson complained that he
was being singled out. (Id.). She directed Wilson to exit the
hall, but he refused to do so, and instead, followed her. (Id.)
She then instructed Wilson to step back away from her, and to
calm down. (Id.). Although Wilson stepped back, he continued to
complain, and he raised his hands in the air with his fists
clinched in a threatening manner. (Id.) Kidd ordered Wilson to
face the wall to be handcuffed, but he refused to comply. (Id.).
Wilson yelled "Ya'll going to have to kill me today". (Id.)
Defendant Scarbrough observed Wilson's noncompliance, and
intervened by administering a one second burst of the chemical
agent Sabre towards Wilson's facial area. (Id.).  Although
Wilson continue to resist, Scarbrough and another officer,
Douglas Parham, were able to restrain Scarbrough while Kidd
handcuffed him. (Id.)

   Kidd and Parham escorted Wilson to the healthcare unit for
decontamination and for a medical assessment. (Id.).  According
to Kidd, she and Wilson had a previous encounter in 2012 while
he was running as runner for her in the prison. Wilson was
terminated from his position, and disciplined for indecent
exposure, after he exposed his penis, while watching Kidd. (Id.)

Defendant Scarbrough also submitted sworn affidavits. (Docs. 29-1; 29-7). He denies Wilson's substantive allegations, and alleges that he observed Wilson refuse to comply with Kidd's commands to exit the main hall, and to turn around, face the wall and submit to handcuffing. (Doc. 29-1 at 1-2). Scarbrough asserts that he also directed Wilson to "cuff" up and that Wilson refused to comply and kept saying "Yall are going to have to kill me today". (Id. at 2). In response, Scarbrough retrieved his canister of Sabre Red and administered one single burst to Wilson's facial area. (Id.). He then restrained Wilson while Kidd placed him in handcuffs. (Id.). Wilson was taken to the Healthcare unit by Kidd and officer Douglas Parhan for decontamination and a medical assessment. (Id.). Scarbrough expressly denies doing anything to injure Wilson's thumb or eyes. (Doc. 29-7 at 1-2).

Defendants also submitted the sworn affidavit of Douglas Parham, who asserts that he observed Wilson yelling and screaming on the main hall during on October 1, 2013. (Doc. 29-6). According to Parham, he observed Scarbrough and Kidd order Wilson to cuff up, and saw Wilson refuse to comply. (Id.). He also observed Scarbrough administer a one second burst of Sabre Red to Wilson's facial area, at which point, Wilson complied. (Id.). Parham and Kidd then escorted Wilson to the Health unit for decontamination and for a medical assessment. (Id.).

Defendants have also submitted Wilson's medical records, incident reports and Wilson's disciplinary record arising from the incident. (Docs. 29-3; 29-9; 29-10; 37; 37-1; 37-2; 37-3; 37-4; 37-5; 37-6; 37-7; 37-8; 37-9; 37-10; 37-11; 37-12; 37-13; 37-14). A "Use of Force" investigative report was prepared by Captain Howard a few days after the incident. (Doc. 29-3 at 4). The report reflects that Captain Howard took statements from Kidd, Scarbrough and inmate Wilson. (Id.). Kidd and Scarbrough reported that Wilson was smoking in a prohibited area, he disobeyed orders to be handcuffed, yelled that "Ya'll are going to have to kill me today", and threw his hands up and clinched his fists in a threatening manner before being administered a one second burst of Sabre Red to his facial area. (Id.) In addition, Wilson admitted that he was smoking in the main hallway, that he was waiving his hands back and forth towards Kidd, and that he was angry because he felt Kidd was picking on him.[2] (Id.). Captain Howard concluded that the use of force was justified. (Id.) Additionally, the disciplinary records reflect that following an investigation, Plaintiff was disciplined for smoking in an unauthorized area. (Doc. 29-9 at 2).

---

[2] In Wilson's written statement submitted the day of the incident, he admitted that he "got loud a lil bit with my hands still in the air" when Kidd told him that he was going to be locked up. (Doc. 29-3 at 10).

Defendants have also submitted Wilson's relevant medical records. A body chart from the date of the injury shows no noticeable injuries, and the medical report from an examination of Wilson immediately after the incident reflects that he was was alert, his skin was in tact, his eyes were flushed with water, and no signs of distress or injuries were noted. (Doc. 29-3 at 12; 37-2 at 19). The report also reflects that Wilson's only complaint was that he could not breathe, that he was administered albuterol nebulizer, and that he was released to prison officials. (Id.)

Later that evening, Wilson made a request for medical services stating his left eye was blurry. (Doc. 29-10 at 20-22). The request was received on October 2, 2013 and a "Nursing Encounter Tool" form from that date noted that Wilson's left eye was blurry, that redness and swelling were present, but there was no associated eye pain. (Id.). An entry from Wilson's medical visit notes that he has a very slight corneal abrasion and erythema in the left eye. (Id. at 29). A steroid eye drop and a patch were prescribed as needed. (Id.)

On November 2, 2013, Wilson filled out another medical request form and stated that his "left eye won't stop jumping". (Id. at 7, 11). Upon examination, it was noted that Plaintiff reported that his vision was blurry and jumping; however, no redness or swelling was observed. (Id.). On November 6, 2013,

Wilson was seen by an offsite physician. (Id. at 11). The chart entry notes there is a possibility of traumatic iritis in the eye.[3] (Id.). The entry further reflects that Wilson refused to read the eye chart with both eyes, and lists a new eye prescription, with 20/20 vision in one eye and 20/70 vision in the other. (Id.).

Notes from Wilson's November 20, 2013 appointment reflects that he reported his "eye feels fine now" but the "lid [is] twitching". (Id. at 16). It also reflects that the iritis had resolved, that Maxitrol was prescribed for Wilson's eye until November 30, 2013[4] and that glasses were ordered. (Id.).

The medical records also show that Wilson was seen by the nurse for thumb pain the day after the incident. (Doc. 29-10 at 1). The pain was reported to be an '8/10' and 'throbby'. (Id.). The nurse reported swelling in the thumb. (Id.). She noted that urgent intervention was not required, but recommended that the thumb be treated with the "R.I.C.E." method.[5] (Id.). She further recommended that Wilson be seen by an M.D. and receive an X-Ray,

---

[3] Traumatic iritis is a traumatic inflammation of the eye. See http://www.summitmedicalgroup.com/library/adult_health/oph_traumatic_iritis/.

[4] Maxitrol is a combination of two antibiotics and a steroid to treat bacterial infections in the eye. See http://www.rxlist.com/maxitrol-side-effects-drug-center.htm.

[5] The term "R.I.C.E." stands for Rest, Ice, Compression, and Elevation. See http://www.uhs.wisc.edu/health-topics/muscles-and-bone/rice.shtml.

which was performed on October 3, 2013. (Id. at 2-3). The scan found no fracture, dislocation, or other significant bony abnormality in the right thumb.[6] (Id. at 3).

On October 9, 2013, Wilson filled out a Health Services Request Form stating that his "right thumb is in serious pain". (Id. at 4). This request was referred to a physician. (Id.). Urgent intervention was again not required, but he was prescribed 500 mg of Naproxen and 750 mg of Robaxin.[7] (Id. at 6). On November 2, 2013, Wilson filed another Health Services Request Form, claiming his thumb was "still swollen and disconnected", and blamed Officer Scarbrough for these issues. (Id. at 7). On that date, the nurse noted redness, swelling, obvious deformity, and a decreased range of motion in the thumb, but no acute distress or joint involvement. (Id. at 8). She further noted that no emergent or urgent intervention was required. (Id.).

---

[6] The doctor noted a "tiny particulate metal like density" at the base of the fifth metacarpal (pinky finger) "that could represent a tiny foreign body or film processing artifact". (Doc. 29-10 at 3).
[7] Naproxen is an anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness. See https://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html. Robaxen (also known as Methocarbamol) is a skeletal muscle relaxant used to treat muscle pain and spasms. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011134/.

Another X-Ray was completed on November 4, 2013, and no fracture or dislocation was seen.[8] (Doc. 29-10 at 12). The impression is listed as "mild osteoarthritis to the right hand". (Id.). On November 11, 2013, an orthopedic referral was made for what was *believed* to be a 'displaced' or 'dislocated' thumb, and pain, swelling, and an inability to bend the thumb were noted. (Id. at 13-14)(emphasis added). An appointment was scheduled with an orthopedic doctor for November 12, 2013, and Wilson was again prescribed Robaxen and Naprosyn.[9] (Id. at 8). On November 20, 2013, Wilson references the dislocated thumb indicated by "Dr. Barber", and indicated that he wanted painkillers. (Id. at 24). Another request for medication is made on December 10, 2013, and Wilson is told that he was only prescribed a Medrol dose pack, which includes a high dose of steroids that is eventually lowered over several days. (Doc. 17 at 3, see Doc. 29-10 at 16). The medical records reflect that on March 12, 2014, Wilson complained of a bump on his thumb; however, no edema or other sign of injury was noted.(Doc. 29-10 at 28).

---

[8] The scan did reveal that the distal interphalangeal joints of all fingers were narrowed and scherotic "due to degenerative changes", and that to a lesser extent the proximal interphalangeal joints also showed degenerative changes. (Doc. 29-10 at 12).

[9] Naprosyn is another name for Naproxen. See supra, footnote 8.

Defendants' Answer, Special Report and supporting materials were converted into a Motion for Summary Judgment on January 14, 2016. (Doc. 47). The parties were notified of the effects of the conversion and provided an opportunity to file briefs and materials in support of or in opposition to the motion. (Id.). Wilson filed a twenty-five page brief in opposition to the motion. (Doc. 46). The summary judgment motion has now been fully briefed and is now ready for resolution.

## II.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (citation omitted)(emphasis in original)).

> The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." The movant can meet this burden by presenting
evidence showing there is no dispute of material fact,
or by showing, or pointing out to, the district court
that the nonmoving party has failed to present
evidence in support of some element of its case on
which it bears the ultimate burden of proof.

Once the moving party has met its burden, Rule 56(e)
"requires the nonmoving party to go beyond the
pleadings and by its own affidavits, or by the
'depositions, answers to interrogatories, and
admissions on file,' designate 'specific facts showing
that there is a genuine issue for trial.'" To avoid
summary judgment, the nonmoving party "must do more
than show that there is some metaphysical doubt as to
the material facts." On the other hand, the evidence
of the nonmovant must be believed and all justifiable
inferences must be drawn in its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F.

Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013)(citations

omitted).

As noted *supra*, in considering whether the Defendants are

entitled to summary judgment in this case, the Court has viewed

the facts in the light most favorable to Plaintiff. Comer v.

City of Palm Bay, 265 F.3d 1186, 1192 (11th Cir. 2001)("We view

the evidence and all factual inferences raised by it in the

light most favorable to the non-moving party, and resolve all

reasonable doubts about the facts in favor of the non-moving

party.")(citations omitted). The requirement to view the facts

in the nonmoving party's favor extends only to "genuine"

disputes over material facts. A genuine dispute requires more

than "some metaphysical doubt as to material facts." Garczynski,

573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id.

Moreover, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F.App'x 798, 800 (11th Cir. Aug. 20, 2011)("In cases where opposing parties tell different versions of the same events one of which is blatantly contradicted by the record – such that no reasonable jury could believe it- a court should not adopt the contradicted allegations." (citations omitted)(unpublished)).[10]

Additionally, the undersigned recognizes that while the Court is required to liberally construe a *pro se* litigant's pleadings, the Court does not have "license to serve as de facto counsel for a party. . . or to rewrite an otherwise deficient pleading in order to sustain an action." GJR Invs., Inc. v.

_____

[10] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

Cnty. Of Escambia, Fla., 132 F.3d 1359, 1369 (11th Cir. 1998)(citations omitted), overruled on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010); see also Giles v. Wal-Mart Distrib. Ctr., 359 F. App'x 91, 93 (11th Cir. 2009) (internal citations and quotations omitted) ("Although pro se pleadings are held to a less strict standard than pleadings filed by lawyers and thus are construed liberally, this liberal construction does not give a court license to serve as de facto counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action.").

Based on a liberal construction of Wilson's complaint, the Court construes his factual allegations as asserting an excessive force claim based upon his altercation with the Defendants in October of 2013, as well as a claim of failure to intervene and/or supervise on the part of Defendant Kidd. The undersigned will discuss each of these claims in turn individually below.

## III. DISCUSSION

### a. Qualified Immunity

#### i. Official Capacity

It is well-established that, "suits against an official in his or her official capacity are suits against the entity the individual represents." Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1998), overruled on other grounds in Turquitt v.

*Jefferson County*, 137 F.3d 1285 (11th Cir. 1998); see *Monell v.*
*Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56
L. Ed. 2d 611 (1978)("[O]fficial capacity suits generally
represent only another way of pleading an action against an
entity of which an officer is an agent."); *Farred v. Hicks*, 915
F.2d 1530, 1532 (11th Cir. 1990). For the purposes of qualified
immunity, it is not disputed that Defendants are state
officials.

Thus, to the extent that Wilson's claims are against
Defendants in their official capacities, his claims are
effectively claims against the State of Alabama. The Supreme
Court has held that states and state officials are not "persons"
subject to liability pursuant to 42 U.S.C. § 1983. See *Will v.*
*Mich. Dep't of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105
L. Ed. 2d 45 (1989). Further, pursuant to the Eleventh Amendment
of the United States Constitution, a state's own citizens may
not sue unless the state consents to suit or Congress acts to
abrogate immunity. See *Carr v. Florence*, 916 F.2d 1521, 1524-25
(11th Cir. 1990). There is nothing before the Court that suggests
that the State of Alabama has consented to the suit or that
Congress has acted to abrogate immunity. Accordingly, Defendants
have absolute immunity against claims asserted against them in
their official capacities.

### ii. Individual Capacity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). A law enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Id. Qualified immunity from suits is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)(internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate individual capacity qualified immunity claims. One inquiry into a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002)(citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)). The Eleventh Circuit has

observed that in determining whether a right was "clearly established", the courts do not require a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)(internal quotation marks omitted); see also Wilson v. Blankenship, 163 F.3d 1284, 1288 (11ᵗʰ Cir. 1998)(internal citation omitted)(emphasis in original)("General propositions and abstractions do not qualify for bright line, clearly established law. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*."). Both elements of the two part test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed appropriate for the case. Pearson v. Callahan, 555 U.S. 223, 241, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009). Based upon a careful review of the record evidence, the undersigned finds that Plaintiff has not shown a constitutional violation; thus, the defense of qualified immunity does not need to be reached. See Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)(finding that in analyzing a qualified immunity case, a

court should first ask whether, "on the facts alleged, a constitutional violation could be found.").

### b. Excessive Force Claim

As noted *supra*, Wilson contends that Defendants used excessive force when he was sprayed with Sabre Red and placed in handcuffs on October 1, 2013. The analysis of an excessive force claim brought under § 1983 begins with determining the specific constitutional right allegedly infringed by the challenged application of force. Graham v. Conner, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). In order to establish an Eighth Amendment excessive force claim against Defendants, Wilson must prove both an objective and subjective component. That is, he must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that the Defendants "act[ed] with a sufficiently culpable state of mind, i.e., that the defendant acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992)(citations omitted). Factors relevant to this determination include the "need for the application of force,

the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Skritch v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002). When considering these factors, courts afford "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." Fennell v. Gilstrap, 559 F. 3d 1212, 1217 (11th Cir. 2009)(quotation marks omitted).

When looking at the objective component of an Eighth Amendment excessive force claim, it is important to note that, inherent in the protection afforded by the Eighth Amendment, is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" Clark v. Johnson, 2000 U.S. Dist. LEXIS 15347 at *34, 2000 WL 1568337 at *12. (S. D. Ala. Sept. 20, 2000) (unpublished) (quoting Hudson, 503 at 9-10). Indeed, " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Hudson, 503 U.S. at 9. (citations omitted). The objective component of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting

Whitley v. Albers, 475 U.S. 312, 327, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).

The use of chemical agents on disruptive prisoners is not per se unconstitutional. Danley v. Allen, 540 F. 3d 1298, 1307 (llth Cir. 2008)(overruled on other grounds)("Pepper spray is an accepted non-lethal means of controlling unruly inmates[,]. . .[and a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders"); Soto v. Dickey, 744 F. 2d 1260, 1270 (7th Cir. 1984)("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment. . ."). However, when chemical agents are used unnecessarily, without penological justification, or for the purpose of punishing or harming an inmate, the use is unconstitutional. See Danely, 540 F. 3d at 1311. (holding that prolonged exposure to pepper spray due to a failure to properly decontaminate an inmate may form the basis of an Eighth Amendment claim); Iko v. Shreve, 535 F. 3d 225, 239 (4th Cir. 2008)(use of additional bursts of pepper spray after inmate attempted to comply sufficiently alleged Eighth Amendment claim).

The first issue with regard to Wilson's Eighth Amendment claim focuses on whether or not there was a penological

justification for the use of the chemical spray on Wilson. In this case, Defendants have submitted uncontested sworn evidence that Defendant Scarbrough utilized Sabre Red only after Wilson failed to comply with commands and engaged in behavior that Defendants viewed as threatening, such as talking loudly and waiving his hands in the air, when he was repeatedly told to place his hands behind his back to be handcuffed. Indeed, in his brief in opposition to Defendants' motion, Wilson himself acknowledges that he became uncooperative and disruptive when informed that he was being placed in segregation for smoking a cigarette on the main hallway. (Doc. 46). Moreover, Wilson does not dispute that he was in fact smoking a cigarette in a prohibited area. And, the prison's use of force investigation resulted in a finding that the use of Sabre Red was justified under the circumstances. While Wilson has submitted the declarations of two fellow inmates who witnessed some or all of the encounter, neither of them contend that Wilson was not smoking, or that he placed his hands behind his back when he was repeatedly directed to do so. Accordingly, the undersigned finds that the uncontested evidence establishes that Scarbrough's use of Sabre Red spray was for a penological reason rather than for the purpose of inflicting harm.

The next issue is whether the force used was excessive in relation to the need for force. The Eleventh Circuit addressed

this issue in Danley, and held that a "short burst of spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." Danley, 540 F. 3d at 1307. The exact same situation presents itself here. While Wilson contends that Scarbrough grabbed another officer's mace and sprayed an "exceeding" amount in Plaintiff's eye at "point blank range" (Doc. 7 at 10), he has not presented facts sufficient to dispute Defendants' specific showing that Scarbrough administered a one second burst to Wilson's facial area. Plaintiff's assertion that an exceeding amount of spray was used is conclusory and offers nothing to suggest the number of bursts or the actual duration of the spraying by Scarbrough. Similarly, while Wilson's fellow inmates assert that "a lot of mace" was utilized, or that Scarbrough used "almost the whole can", their assertions are conclusory at best. Here again, neither statement offers information regarding the number of bursts of spray or the actual duration of the spraying by Scarbrough. Further, Askew offers absolutely no basis for his assertion that Scarbrough sprayed "almost the whole can". Such conclusory, unsupported assertions, based merely on subjective beliefs, are not sufficient to create a genuine issue of material fact. See *e.g.* Waddell v. Valley Forge Dental Associates, Inc., 276 F, 3d 1275, 1279 (11th Cir. 2001). Given the uncontested record reflects that a single burst of spray was

utilized in an effort to control Wilson, who was exhibiting disruptive behavior, the undersigned finds that there is no violation as to the amount of force used in relation to the need for force.

Finally, the Court must consider whether Wilson's exposure to the pepper spray caused injury that violates the Eighth Amendment. In the instant case, it is undisputed that immediately after the incident, Wilson was taken for decontamination and evaluation in the Health unit. The only injuries alleged by Wilson are a pinched nerve and eye irritation caused by a single burst of pepper spray to the face and an injured thumb. As noted *supra*, Wilson's only complaint when he reached the Health unit immediately after the October 1, 2013 incident was that he could not breathe. He was provided treatment with an aerosol nebulizer and his eyes were flushed with water. (Doc. 29-3 at 12). A body chart showed no noticeable injuries, and the medical staff noted no signs of distress. The following day, and during a couple of subsequent visits, Wilson complained about his right thumb; however, an X-ray performed on October 3, 2013 showed no fracture or dislocation (Doc. 29-10 at 3), and a second one performed a month later, on November 4, 2013 again revealed no fracture or dislocation. (Doc. 29-10 at 12). As a result of the second X-ray, mild osteoarthritis was diagnosed. (Id.). While a November 11, 2013 entry on Wilson's

medical chart indicates that the thumb appeared to be dislocated and swollen, that he would be started on steroids and referred for orthopedic evaluation, there are no X-rays in the file documenting a dislocation, and it appears that the only course of treatment recommended as a result of the orthopedic evaluation was the use of Medrol dose pack. (Doc. 29-10 at 16, 24; Doc. 17 at 3). Similarly, Wilson made multiple complaints about his left eye following the October 1, 2013 incident, and the medical records document a very slight corneal abrasion and erythema in the left eye, and possible traumatic iritis in the eye. (Doc. 29-10 at 11, 29). By November 20, 2013, the records reflect that Wilson reported that his "eye feels fine now" but the "lid [is] twitching". (Id. at 16). The note further reflect that the iritis was resolved, and that Maxitrol was prescribed for Wilson's eye until November 30, 2013.  Glasses were also ordered; however, the notes reflect that Wilson refused to read the eye chart with both eyes. (Id.).  The upshot of these records is that any injuries arguably sustained by Wilson as a result of the October 1st incident were de minimis at best, and had significantly improved by the middle of November 2013. Compare Maddox v. Gibson, 2014 U.S. Dist. LEXIS 38252 at *28-29, 2014 WL 1202743 at *8-9 (S.D. Ala. Mar. 24, 2014)(lingering effects after the use of pepper spray considered de minimis despite continued complaints when a subsequent exam showed no

chemical side effects a month later) with Johnson v. Ashworth, 2014 U.S. Dist. LEXIS 41620 at *32-34, 2014 WL 1331019 at *10 (S.D. Ala. Mar. 27, 2014)(a genuine issue of material fact existed for the jury on the subject of *de minimis* injury where diagnosed acute iritis took two months to be resolved, ultimately ending in a loss of vision and the development of a cataract) and Sumner v. Glover, 2008 U.S. Dist. LEXIS 55671 at *5, 2008 WL 2873672 at *6-14 (M.D. Ala. July 23, 2008)(corneal abrasion and swelling caused by pepper spray and being rammed into the wall required several rounds of multiple prescription eye drops and the stitching of the eyelids together for temporary relief, presenting a question of material fact as to the use of excessive force in the situation).

Accordingly, for the reasons set forth above, the Court concludes that there is no genuine issue of material fact that precludes the entry of summary judgment on Wilson's Eighth Amendment claim. Therefore, the undersigned recommends that Defendants' motion be granted with respect to Wilson's excessive force claim against Scarborough.

### c. Failure to Intervene/Supervisory Liability

In addition to his excessive force claim against Defendant Scarborough, Wilson also alleges that Defendant Kidd failed to intervene and "stop Scarbrough from assaulting me", while further noting that she was the supervisor on the shift in which

the incident occurred. (Doc. 7 at 5). He further alleges that Kidd failed to supervise Wilson in order to ensure that he was properly decontaminated, claiming that she did not let him wash after the incident with pepper spray. (Doc. 46 at 19-20). The second claim is refuted multiple times by the record, both by affidavits of the officers involved and the medical charts present on the day of the incident. (Doc. 29-3; Doc. 29-10 at 31).

Wilson's vague claim of supervisor liability must fail. On this subject, the Eleventh Circuit held:

> [Supervisor] liability under section 1983 must be based on something more than a theory of *respondeat superior*. Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions and the supervising official and the alleged constitutional violation.

Dolihite v. Maughon, 74 F. 3d 1027, 1052 (11th Cir. 1996). In the instant case, while Wilson alleges that Kidd was directly responsible for the altercation that ultimately ended in Scarbrough's use of force, the undersigned has outlined in detail why this incident does not rise to the level of a constitutional violation. The Eighth Amendment is only violated by "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [.]" Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811

(1994). Prison officers may be held liable under § 1983 if "they fail or refuse to intervene when a constitutional violation occurs in their presence"; however, for this liability to attach, the officer in question "must have been in a position to intervene." Terry v. Bailey, 376 F. App'x 894, 896 (11th Cir. 2010)(citing Ensley v. Soper, 142 F. 3d 1402, 1407 (11th Cir. 1998)).

As the undersigned has concluded that no reasonable jury would conclude that Scarbrough used excessive force against Wilson in this case, it stands to reason that no reasonable jury could find that Kidd was liable in her position as a supervisor or for failing to intervene. If no excessive use of force takes place, an officer has no duty to intervene. Crenshaw v. Lister, 556 F. 3d 1283, 1294 (11th Cir. 2009); McBride v. Rivers, 170 F. Appx. 648, 658 (11th Cir. 2006)(defendant could not be held liable for failing to intervene after court determined no excessive force had been used). Accordingly, the undersigned recommends that Kidd be entitled to summary judgment on Plaintiff's claims of supervisory liability and failure to intervene.

IV.   **CONCLUSION**

For the reasons set forth above, the undersigned concludes that Defendants Gary Scarbrough and Ashley Kidd are entitled to

summary judgment on all claims. Accordingly, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED**, that this action be **DISMISSED** with prejudice, and that judgment be entered in favor of Defendants Gary Scarbrough and Ashley Kidd and against Plaintiff Zachery Wilson.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." *11th Cir. R. 3-1.* In order to be specific, an objection must identify the specific finding or recommendation to which objection is made,

state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this **7th** day of September, **2016.**

/s/ **SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**